IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

STEPHANY SWART, M.D.,

       Plaintiff,

v.                       //   CIVIL ACTION NO. 1:14CV10
                                     (Judge Keeley)

SURENDRA PAWAR, M.D., MONONGALIA
RADIOLOGY ASSOCIATES, P.C.,

       Defendants.

SURENDRA PAWAR, M.D., and MONONGALIA
RADIOLOGY ASSOCIATES, P.C.,

       Counter-Claimants,

v.

STEPHANY SWART, M.D.,

       Counter-Defendant.

SURENDRA PAWAR, M.D., and MONONGALIA
RADIOLOGY ASSOCIATES, P.C.,

       Third-Party Plaintiffs,

v.

ERIC D. JOHNSON, M.D., and
CYNTHIA JOHNSON,

       Third-Party Defendants.

ERIC D. JOHNSON, M.D., and
CYNTHIA JOHNSON,

       Counter-Claimants,

v.

SURENDRA PAWAR, M.D., and MONONGALIA
RADIOLOGY ASSOCIATES, P.C.,
       Counter-Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

## I. INTRODUCTION

Pending for the Court's consideration are competing motions for summary judgment. The first was filed by the defendants, counter claimants, and third-party plaintiffs, Surendra Pawar, M.D. ("Pawar"), and Monongalia Radiology Associates, P.C. ("MRA"). (Dkt. No. 117). Pawar and MRA seek summary judgment on all counts of Swart's complaint against them, as well as Counts I and II of their counterclaim against Swart. Further, Pawar and MRA seek summary judgment in MRA's favor on Count III of its third-party complaint against Eric Johnson, M.D. ("Johnson"), as well as Count I of Johnson's counterclaim against both Pawar and MRA. The second motion was filed by the plaintiff and counter defendant, Stephany Swart, M.D. (Dkt. No. 119), seeking summary judgment in her favor on all Counts of Pawar and MRA's counterclaim. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** both motions for summary judgment.

## I. BACKGROUND

This case rises from the ashes of a failed Professional Corporation founded by Swart and Pawar to provide radiological services for certain hospitals in north central West Virginia. As

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

it must, the Court construes the facts in the light most favorable

to the non-movant.[1] See <u>Ussery v. Manfield</u>, 786 F.3d 332, 333 (4th

Cir. 2015).

## A.    Factual Background

As recounted by the parties, the actions in this case span a

time-frame from 2008 until 2012.  Evidence filed in support of the

parties' motions includes, among others, emails, letters,

contracts, loan documents, and testimony from no less than nine

depositions.

Gleaned from the evidence are certain facts that are either

confirmed by all parties, undisputed by the opposing party, or

self-evident from the exhibits.  Nevertheless, the parties

vigorously dispute a significant number of material facts.

### 1.    Undisputed Facts

### a.    Corporate Formation and the Beginnings of MRA

In mid-2008, Pawar was working as a radiologist for Amerirad,

Inc. at Monongalia General Hospital ("MGH") in Morgantown, West

---

[1]Thus, pertaining to Swart's motion for summary judgment, the
Court will construe the facts in the light most favorable to Pawar
and MRA, and when considering Pawar and MRA's motion, the Court
will construe the facts in the light most favorable to Swart and
Johnson.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Virginia. Due to Amerirad's pending bankruptcy, MGH management approached Pawar and another Amerirad radiologist, Dr. Teppe Popovich ("Popovich"), about forming a practice group to provide radiological services at MGH (Dkt. No. 122-2 at 3-4). Pawar and Popovich embraced the idea and formed MRA as a Pennsylvania corporation on August 28, 2008. Id. at 7. Just days later, the two interviewed Swart, who joined the group on September 4, 2008. Id. at 6.

As initially formed, Pawar was MRA's president, Popovich its treasurer, and Swart its secretary. Each doctor owned one-third of MRA's shares and served as a Director (Dkt. Nos. 122-2 at 5; 125-5 at 20). Shortly after MRA was formed, Popovich left the group, leaving Swart and Pawar as co-equal 50% shareholders and co-directors of MRA. Pawar retained his position as president of MRA, while Swart kept her position as secretary, and also assumed the position of treasurer vacated by Popovich (Dkt. No. 125-2 at 7). After Popovich's departure, Swart and Pawar executed an Amended Shareholders' Agreement (the "Shareholder Agreement") that conditioned any future dilution of their interest in the corporation through the issuance of new shares upon both parties providing written consent (Dkt. No. 122-1 at 5).

4

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Although incorporated in Pennsylvania, MRA established its principal place of business at MGH in order to provide the hospital with radiological services (Dkt. No. 118 at 5). In furtherance of that objective, MRA entered into a "Radiology Agreement" with MGH on November 12, 2008 (the "2008 Agreement"), with an effective date retroactive to September 5, 2008 (Dkt. No. 122-1 at 46-73). The 2008 Agreement had a term of three years and contained a provision requiring MRA to maintain Pawar as its Medical Director. Id. at 54, 64. The lone MRA signatory to the 2008 Agreement was Pawar, who signed in his capacity as president of MRA. Id. at 69.

In addition to serving as directors of MRA, Swart and Pawar were also employees of the corporation. Each signed written employment contracts, effective September 1, 2008. Id. at 88-107. Pawar signed both contracts as President and Swart signed as Secretary. Each also signed their respective contracts in their personal capacity, and both contracts were witnessed and signed by Cathy Berkshire. Id. at 99, 107. Swart's contract provided that MRA would pay her an annual salary of $450,000. Id. at 100. Pawar's contract provided that MRA would pay him $500,000 per year, of which $50,000 was designated as payment for Pawar as Medical Director of Radiology at MGH. Id. at 88.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Approximately one year after contracting with MGH, MRA executed a "Physician Services Agreement" for radiology services with Preston Memorial Hospital ("PMH") (the "PMH Agreement"). Id. at 78-87. The term of the PMH Agreement extended from November 20, 2009 through February 2, 2013, and it too contained a provision requiring MRA to maintain Pawar as Medical Director for Radiology at PMH. Id. at 80, 82. As with the MGH Agreement, Pawar was the lone MRA signatory to the PMH Agreement. Id. at 87.

As a consequence of the PMH Agreement, MRA and Pawar executed a "Second Addendum to Employment Contract" that increased Pawar's pay by $2,500 per month for every month he served as Medical Director, as required in the PMH Agreement. Id. at 98-99. Swart signed the second addendum to Pawar's contract in her capacity as secretary, and it was witnessed and signed by Cathy Berkshire. Id. at 99.

**b.    Employment of Dr. Eric Johnson**

Performing the contract with MGH required MRA to hire additional radiologists to handle the workload.[2] Accordingly, on

---

[2]Attached to each of the MGH Agreements was a list of approved radiologists. The list attached to the 2008 Agreement listed only Pawar, Swart, and Popovich (Dkt. No. 122-1 at 70). The list attached to the 2011 Agreement had expanded to include Pawar,

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

March 27, 2009, MRA entered into an employment contract with Eric Johnson, M.D. ("Johnson"). <u>Id.</u> at 108-14. Johnson's contract provided that MRA would pay him an annual salary of $400,000. In addition, the contract contained an ownership option clause that permitted Johnson to join MRA as a co-equal shareholder after completing one year of employment. <u>Id.</u> at 113. The contract was signed by Pawar, Swart, and Johnson, and witnessed by Cindy Berkshire.

Sometime in mid to late 2010, after completing one year of employment with MRA, Johnson verbally informed Pawar that he intended to exercise his ownership option (Dkt. No. 118 at 9; Dkt. No. 122-8 at 8). The contract conditioned execution of the ownership option as follows: "A prerequisite for the acquisition of shares by [Johnson] shall be [Johnson's] acceptance and execution of the Shareholders' Agreement executed by the other shareholders of [MRA]" (Dkt. No. 122-1 at 113).[3] Swart, however, did not want to

---

Swart, Eric Johnson, Melissa Johnson, Harry Bishop, and Jeffrey Yost. <u>Id.</u> at 149.

   [3]The Court does not read this provision to mean that Pawar and Swart could wait until after Johnson exercised the option to then decide whether they wanted to allow him to become a co-equal shareholder. Rather, the condition merely required Johnson to sign an agreement containing the same provisions already agreed to by

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

provide Johnson with voting shares (Dkt. No. 122 at 13). Johnson did not give formal written notice that he was exercising his ownership option until July, 2011 (Dkt. No. 122-8 at 8).

Meanwhile, on March 17, 2011, Pawar and Johnson executed a second employment contract containing essentially the same terms as Johnson's first contract with three exceptions. The second contract increased Johnson's annual salary to $450,000, provided that any shares acquired under the ownership option would be non-voting shares, and conditioned the effectiveness of the contract on Johnson "purchasing and maintaining a home in Morgantown, West Virginia" (Dkt. No. 122-1 at 155-62). The new contract also stated that it superceded the 2009 employment contract. Id. at 155. Swart refused to sign Johnson's new contract, asserting that the language in it differed from the original contract by allowing Pawar to fire Johnson unilaterally (Dkt. No. 122 at 13).

---

Swart and Pawar in the then existing Shareholder's Agreement. Support for this reading is found in the fact that the ownership option contained language clearly establishing how the parties would determine the price of the shares and how Johnson would pay for them. It does not provide that they may think about it or negotiate it later. In addition, the language is clear: The "employee shall have the option." Thus, the condition is on Johnson agreeing to terms of a shareholder agreement that Pawar and Swart would also be subject to, not whether Pawar and Swart could decide whether they would allow Johnson to exercise the option.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Prior to this, on February 11, 2011, Johnson and MRA had executed a "Physician Loan Agreement" and related promissory note (collectively "the loan documents"), under which MRA agreed to loan Johnson $90,000 for a term of five years at 5% interest annually (Dkt. No. 122-8 at 11-17). The loan documents provided for 1/60 of the loan to be forgiven for each month that Johnson worked for MRA. Id. at 11, 14. By its language, the loan could be terminated for a variety of reasons, including any material breach of the loan agreement or default under the note. Id. at 12, 14. Furthermore, the note prescribed that, should Johnson no longer be eligible for forgiveness because he was no longer employed by MRA, any remaining principal and accrued interest would become immediately due and payable. Id. at 14. Pawar and Johnson were the only signatories to the loan agreement, and Johnson was the sole signatory to the promissory note. Id. at 13, 15.

Ultimately, Pawar terminated Johnson's employment with MRA in July or August of 2011 (Dkt. No. 118 at 11; Dkt. No. 122-8 at 3).

**c.    MRA's 2011 Renewed Agreement with MGH and the Breakup**

In late 2010, MGH's Chief Financial Officer, Darryl Duncan ("Duncan"), initiated discussions with Pawar on behalf of MRA to negotiate the renewal of the 2008 Agreement. Duncan expressed

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

concerns that Pawar, who was in his early 60s at that time, might
not continue as medical director for the duration of the renewed
agreement (Dkt. No. 122-9 at 5). Confirming Duncan's concerns,
Pawar indicated that he might change to part-time status, which
would preclude his eligibility to serve as medical director. Id.

Based on these discussions, Pawar and Duncan recognized that
the necessity of identifying a successor to Pawar. Id. Although
Duncan acknowledged that it was MRA's responsibility to suggest a
successor, he believed neither Swart nor Johnson would be an
acceptable candidate, and that MRA would need to seek an outside
person to assume the position. Id.

Historically, during the course of the 2008 Agreement,
management at MGH had from time to time, expressed concerns about
MRA's overall performance, including backlogs, turnaround time, and
staffing levels (Dkt. No. 122-9 at 3, 2; Dkt. No. 122-6 at 8; Dkt
No. 122-3 at 6). Duncan nevertheless felt that MGH and MRA could
have a long term relationship, despite the performance issues, so
long as MRA could recruit "another two or three physicians who
would join them and make the group solid going forward" (Dkt. No.
122-9 at 7).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

When it came time to renegotiate the 2008 Agreement, MGH and MRA executed a "Radiology Agreement," effective January 1, 2011 (the "2011 Agreement") that essentially renewed the 2008 Agreement with a term extending through December 31, 2015. (Dkt. No. 122-1 at 123-48). The 2011 Agreement also contained a clause similar to that in the 2008 Agreement, requiring MRA to retain Pawar as medical director, but further requiring MRA, within 30 days, to submit a succession plan for approval by MGH in the event of Pawar's departure. (Dkt. No. 122-1 at 132).

Attached as "Exhibit A" to the 2011 Agreement was a list of approved physicians, which included full-time radiologists Pawar, Swart, and Johnson, as well as part-time radiologists Melissa Johnson, M.D., Harry Bishop, M.D., and Jeffrey Yost, M.D. Id. at 149. As with the 2008 Agreement, Pawar was the only MRA signatory to the 2011 Agreement. Id. at 148.

Sometime during the first year under the 2011 Agreement, MGH became so dissatisfied with MRA's performance, id. at 10, that MCH terminated the 2011 Agreement and the services of MRA on December 31, 2011 (Dkt. No. 10 at 1). Duncan noted several reasons for MRA's termination, including the group's failure to recruit new members, which had led to stagnation in performance and inability to keep up

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

with the workload. Id. 122-9 at 10, 12, 20. He also noted that Swart and Pawar had "reached an impasse" that was preventing MRA from signing contracts and recruiting additional doctors. Id. at 12, 19, 20. Finally, he noted that MRA had not submitted a satisfactory succession plan as required under the 2011 Agreement. Id. at 20.

With the looming void resulting from the premature termination of MRA's 2011 Agreement, MGH issued "Requests for Proposal" ("RFP") in October, 2011, seeking applicants to provide radiology services to the hospital (Dkt. No. 122-2 at 5). The RFP sought proposals from practice groups to provide radiological services under a new contract to commence July 1, 2012. Id. In the mean time, because MGH still needed radiology services for the period between December 31, 2011, and July 1, 2012, Pawar, through a newly formed entity, agreed to provide radiological services for that six month period. Id. Further, he responded to the RFP and, through his new entity, placed a bid to win the new radiology contract. Id. Swart and Johnson also responded to the RFP, placing a bid for the new contract through their own newly formed entity. (Dkt. No. 125-1 at 36-38). Neither of these new entities won the contract, however,

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

which was awarded to a wholly unrelated entity, Radiological Physicians Associates (Dkt. No. 122-9 at 20).

### d.   Dr. Joseph Ridgeway

In November, 2010, Pawar and Swart interviewed Dr. Joseph Ridgeway ("Ridgeway") for a position with MRA (Dkt. No. 122 at 6). When Ridgeway applied, he informed Swart, Pawar, and Duncan that his Ohio license had been suspended as a result of a previous DUI conviction (Dkt. No. 122-9 at 11, 16). Shortly thereafter, Swart became aware that Ridgeway had additional criminal history, including multiple DUIs, incidents of domestic violence, and cocaine abuse. (Dkt. No. 122 at 7, 16). Based on this information, Swart refused to sign Ridgeway's employment contract. Id. at 6-7. Pawar, however, did sign the employment contract with Ridgeway in November, 2010, and the parties moved forward to finalize his employment.

In order for Ridgeway to perform professional radiology services, he needed to submit to a lengthy approval process by MGH and receive proper state licensing. Id. at 14. Part of the process required Ridgeway's appearance before the hospital's Board to explain any previous professional issues (Dkt. No. 122-9 at 14). During their meetings with Duncan, the Board discussed the subject

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

of Ridgeway's checkered past as well as the fact that Swart had not signed Ridgeway's employment contract. Id. at 14, 21.

Duncan and Pawar "speculated" that the only way the Board could have known about Ridgeway's past, other than the admitted DUI and license suspension, would have been if Swart had discussed it with her neighbor and MGH board member, Dr. Wade Stoughton. Id. at 14. While Swart has acknowledged that she spoke to Stoughton about Ridgeway's past, she claims the information she discussed was a matter of public record (Dkt. No. 122 at 17). Unhappy about Swart's actions, Pawar suggested that Ridgeway's attorney send Swart a letter telling her to stop (Dkt. No. 120-4 at 2).

MGH continued its internal review of Ridgeway and ultimately concluded that he was satisfactory to perform services at the hospital (Dkt. No. 122 at 11, 16). Ridgeway received his West Virginia State Medical License and staff privileges at MGH in June, 2011, roughly seven months after signing his employment contract, at which point he began performing radiology services for MRA. Id. at 6-7.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

    **e.    Bookkeeping and the Accounting Firm of Kline, Koppel, and
        Koryak, P.C.**

The "Bylaws of Monongalia Radiology Associates P.C." (the
"Bylaws") provide that the treasurer shall "have custody" of the
company's funds, keep accurate accounts, deposit all corporate
monies, and disburse funds as ordered by the Board (Dkt. 122-1 at
20). Among other things, the corporation must keep "correct and
complete books and records of account." Id. Furthermore, MRA's
Bylaws specify that it is for the Board of Directors to determine
the conditions and regulations regarding inspection of the
corporate books (Dkt. No. 122-1 at 21).

From its inception, however, MRA contracted for all accounting
services and related functions to be performed by the accounting
firm of Kline, Keppel & Koryak, P.C. ("the Kline firm").[4] The Kline
firm made all disbursements to Swart and Pawar, and prepared all
necessary corporate tax filings. One of the duties of the Kline
firm was to reimburse the parties for their expenses. Both Swart's
and Pawar's employment contracts provided that MRA would reimburse
them up to a maximum of $10,000 per year "for all reasonable

---

[4]It appears that the Kline firm also prepared Pawar's and
Swart's personal tax returns. See e.g., Dkt. No. 122-7 at 4; Dkt.
No. 118 at 9.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

business and professional expenses incurred ... in connection with
[their] employment" (Dkt. No. 122-1 at 89). Swart and Pawar,
however, often submitted expenses for reimbursement that ran well
beyond the $10,000 limit (Dkt. No. 122-5 at 6-18). In such cases,
the Kline firm and MRA utilized a system of "evening-up," under
which the Kline firm would provide a check to the shareholder with
the lower amount of reimbursed expenses so that the amount given to
each shareholder was the same (Dkt. No. 122-5 at 4-5; Dkt. No. 122-
7 at 8).[5]

At least as early as January, 2011, Swart began to request
financial information from the Kline firm (Dkt. No. 122 at 14; Dkt.
No. 122-7 at 8, 13). At the direction of Pawar and MRA's counsel,
Mark Krauland ("Krauland"), the Kline firm declined to provide the
information to Swart, stating that she would have to seek it from
Pawar (Dkt. No. 122 at 15; Dkt. No. 122-7 at 9, 13). When she asked
Pawar, however, he told Swart she would have to sign a
confidentiality agreement before he would turn the records over,

_____

[5]Pawar would often submit significantly higher expense reports
to the Kline firm for reimbursement; however, the evening up
process was designed to provide "evening-up bonuses" to Swart (or
to Pawar if the expense levels were reversed) so that the net
amount received by each shareholder was the same (Dkt. No. 122-5 at
5).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

and that he would have Krauland send one to her (Dkt. No. 122 at 3;
Dkt. No. 122-1 at 115). Swart asserts that she never received, nor
did she ever sign, any such agreement; furthermore, as an equal
shareholder in MRA, she contends that she was not required to do so
(Dkt. No. 122 at 3).

### 2.    Swart's Factual Allegations

### a.    Pawar's Unilateral Control of MRA

Swart alleges that Pawar ran MRA as if he were the sole owner
by exercising unilateral control and decision making, even going so
far as to indicate to third parties that he was the sole owner
(Dkt. No. 1-1 at 4, 7). In support of her allegations, Swart points
to a variety of Pawar's actions. First, Pawar acted beyond his
authority by refusing to allow Swart to review financial records
and employment contracts, despite the fact that she was Treasurer,
Director, and a co-equal owner of MRA. Id. at 5, 15. Second, Pawar
reduced Swart's pay by falsely telling the Kline firm that she had
not worked on days when she had. Id. at 5, 8. Third, without her
input or agreement, Pawar hired several physicians, including one
with a criminal past and suspended license, thereby requiring MRA
to pay expensive tail insurance. Id. at 14.  Fourth, Pawar executed
the 2011 Agreement with MGH, provided MGH with a succession plan,

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

and unilaterally named Johnson as the Vice-Chairman of the Imaging Services Department, all without her approval or agreement. Id. at 7. Fifth, Swart alleges that Pawar fraudulently benefitted by repeatedly funneling unauthorized personal and business expenses through MRA. Id. at 9-14. Finally, according to the complaint, Pawar intentionally omitted Swart's name as a Director of MRA on multiple filings with the West Virginia and Pennsylvania Secretaries of State. Id. at 8.

**b.    Pawar's Efforts to Discredit Swart**

Swart's complaint alleges that, in an attempt to terminate her relationship with MRA, Pawar made efforts to discredit her with MGH and PMH. Id. at 7. One of the ways in which Swart claims Pawar discredited her was by falsely accusing her of failing to keep up her continuing medical education ("CME") hours. Swart claims that Pawar falsely accused her of submitting fraudulent CME hours, and falsely informed MGH and PMH that she lacked the requisite CME hours to perform services. Id. at 6. This resulted in MGH temporarily suspending Swart's credentials, which prevented her from reading mammography film. Id.

Another method by which Pawar allegedly discredited Swart was by manufacturing two fictitious patient complaints. Id. at 6-7.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

According to Swart, Pawar informed others, including hospital staff, of the fraudulent complaints. Id. She further avers that she spoke with MGH's patient advocate, who confirmed that no patient had ever filed a complaint against her. Id. at 6.

Swart claims Pawar lied to others on multiple occasions when he told them that she had missed work, had left work early, or had gone missing for extended periods during her shifts. Id. at 5-6. According to Swart, she often came into work early, worked late, and prearranged any time off with Pawar (Dkt. No. 1-1 at 5-6; Dkt. No. 125-1 at 9-12).

Finally, Swart claims that Pawar wrongfully told third parties that West Virginia University ("WVU") had terminated her from her previous position (Dkt. No. 1-1 at 7). To the contrary, she avers that she grew tired of the position and left WVU of her own volition (Dkt. No. 129-9 at 2-3).

### c.  Pawar Misrepresented the Contracts with MGH and PMH.

According to Swart, Pawar told her that he was Chairman of the Radiology Department at PMH and, as such, PMH had required MRA to pay him a higher salary for that position (Dkt. No. 1-1 at 14). Pawar also demanded that Swart sign the PMH Agreement the same day it was presented to her, before she had any opportunity to review

19

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

it with PMH (Dkt. No. 125-1 at 3-4). Moreover, he told her that MGH

also had required MRA to pay him a higher salary (Dkt. No. 1-1 at

14). Swart avers that, when she discussed Pawar's additional salary

with PMH, the hospital denied it had ever required such, and

informed her that it believed Pawar was the sole owner of MRA (Dkt.

No. 125-1 at 3-4).

### 3. Pawar's Factual Allegations

### a. Swart's Misrepresentations About her Past Employment

Pawar alleges that Swart misrepresented the facts surrounding

her departure from WVU. Id. at 37. He claims that, although Swart

told him she had resigned, in actuality WVU had terminated her. Had

he known that, Pawar asserts, it would have dissuaded him from

asking her to become an equal shareholder in MRA. Id. Furthermore,

Pawar believes that Swart mislead him on a host of other matters,

including her work ethic, education, skill level, and CME hours.

Id. It was based on these misrepresentations, Pawar contends, that

he asked Swart to join MRA. Id. 37-38.

### b. Swart's Poor Work Habits

Pawar avers that, sometime during 2009, Swart began to exhibit

poor work habits (Dkt. No. 10 at 25). Specifically, in his

counterclaim, Pawar alleges that Swart constantly left work early,

20

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

would disappear for long periods in the afternoons, would call off work, leaving MRA understaffed, and failed to comply with her CME requirements Id. Moreover, Pawar alleges that, throughout 2009 and 2010, Swart exhibited poor work habits. Moreover, due to shortfalls in her CME credits, MGH twice was compelled to suspend her medical privileges to read mammography film. Id. at 26.

In his counterclaim, Pawar lists multiple ways in which Swart failed to adhere to her employment contract, including generally failing to work an adequate amount of hours, rendering substandard service, failing to cooperate in hiring additional personnel, failing to obtain the required CME credits, failing to be "on-call" or to respond to calls, and making false statements about MRA to third-parties at MGH. Id. at 32-33.

### c. Pawar's Expenses were Legitimate and Swart was Equally Compensated

Pawar denies that any of his submitted expenses were personal or in any way otherwise improper (Dkt. No. 10 at 7-12). Regardless, he avers that the "evening-up" accounting process utilized by the Kline firm compensated Swart by providing "even up bonuses" for any differences in the amount of reimbursed expenses. Thus, he

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

contends, Swart ultimately received the same amount of money that he did. Id.

d.    **Swart's Disruption of the Hiring and Employment Process**

According to Pawar's counterclaim, Swart repeatedly interfered in employment matters at MRA. Allegedly, she refused to sign Johnson's second contract because she did not want her ownership share diluted. Id. at 26-27. Pawar asserts that Swart convinced Johnson that it was Pawar who was blocking Johnson's exercising of his ownership option. Id. at 26-27. Pawar posits that, subsequently, Swart and Johnson engaged in a concerted effort to destroy MRA so that they could eliminate him from the relationship and secure the MGH contract for themselves. Id. at 27. As a result, Pawar claims Johnson became openly hostile to him, as well as to other MRA and MGH employees. Id. Ultimately, Pawar claims that he had no alternative left except to terminate Johnson's employment. Id. at 28.

In addition, Pawar claims Swart disrupted the hiring of Dr. Ridgeway by undertaking a campaign to derail his credentialing process. Id. at 27. Specifically, Pawar states that Swart raised objections to Ridgeway with multiple members of the hospital staff and Board at MGH, including discussing Ridgeway's criminal past

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

with her neighbor and MGH Board member, Dr. Wade Stoughton (Dkt. No. 10 at 27; Dkt. No. 122-9 at 14).

Finally, Pawar claims he attempted to hire a part-time radiologist, Peter Caruso, M.D. ("Caruso"), but was blocked once again by Swart (Dkt. No. 10 at 28), who, upon learning of Caruso's hiring, telephoned him advising him not to report for work. Id.

### e.   Swart and Johnson's Efforts to Acquire the MGH Contract

Pawar alleges that Swart and Johnson approached Duncan, MGH's Chief Executive Officer, seeking to terminate MRA's contract with MGH so the two of them could secure it. Id. at 27-28. Furthermore, Pawar claims that proof of their intent to oust him is evident from the fact that Swart and Johnson eventually placed a bid for the new contract through their own independent entity (Dkt. No. 125-1 at 36-38). In furtherance of their plan, Swart, while still a Director and shareholder of MRA, allegedly attempted to discredit Pawar by telling MGH board members that he was "culturally different," alleging that millions of dollars had gone missing from MRA, and that Pawar wrongfully had denied her access to MRA's financial records. Id. at 29. Further, Pawar avers that, because of Swart's negative statements to MGH board members, some board members

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

intervened and removed Pawar from consideration of the new contract. Id. at 36.

### 4.    Johnson's Factual Allegations

Johnson's relationship with Pawar was cordial at first (Dkt. No. 122-8 at 2, 6); Johnson socialized with Pawar and acknowledges that Pawar recommended that Johnson replace him as Medical Director. Id. at 2, 5. In May, 2011, however, after Johnson had tried to enforce the ownership option in his employment contract, their relationship began to deteriorate. Id. at 2. Pawar told Johnson that, under the terms of his 2009 employment contract, he was required to buy a home in Morgantown. Id. at 2, 10. When Johnson told Pawar that this requirement was never discussed and that the contract contained no such language, Pawar stormed around his office yelling and screaming. Id. at 2. Johnson claims that Pawar subsequently wrote a letter falsely claiming that Johnson was the one who had yelled. Id.

Johnson was aware that Swart opposed signing the 2011 employment contract, but believed it was due to a provision allowing Pawar to unilaterally fire Johnson. Id. at 5, 9. Indeed, he acknowledges that it was Swart who, as early as late 2010, had blocked his ownership effort. Id. at 5. Nonetheless, his

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

relationship with Swart was a good one; they even continued to work together at PMH for a year-and-a-half after the collapse of MRA. Id. at 2. Johnson also disagrees with Pawar's allegations regarding Swart's work hours, purported issues with alcohol use, or disappearing during the day. Id. at 6. By the early part of 2011, Johnson believes that it was Pawar who blocked his ownership interest in MRA based on Johnson's failure to purchase a house in Morgantown (Dkt. No. 122-8 at 5,8; Dkt. No. 124-1 at 16-17).

Johnson also disputes facts surrounding the MRA loan. He acknowledges receiving the proceeds under the loan in February or March, 2011, but maintains he only received $86,000 (Dkt. No. 122-8 at 3,10). While admitting he made no payments on the loan, Johnson disputes his liability for the remaining principal because MRA had terminated him "illegal[ly]," given that such action required that both Pawar and Swart agree to it. Id. at 3-4. Further, MRA breached the employment contract by refusing Johnson's exercise of the ownership option it contained. Johnson contends that MRA is liable to him for an amount far greater than any liability he might be subject to under the loan contract (Dkt. No. 60 at 11, 15; Dkt. No. 124-1 at 22).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

In addition, Johnson alleges several other improper actions by Pawar and MRA. First, when Pawar presented Johnson with the 2011 employment agreement, he allegedly stated that it had to be signed right away, effectively forcing Johnson to sign it under duress (Dkt. No. 60 at 13; Dkt. No. 122-8 at 4). Johnson further questions whether the 2011 employment contract produced in discovery is the actual contract he signed (Dkt. No. 124-1 at 27). Second, Johnson claims that Pawar sent him a termination email at 8 o'clock on a Sunday night that falsely accused him of threatening to kill Pawar, and directed him not to report for work the following morning (Dkt. No. 124-1 at 17). Finally, Johnson alleges that MRA and Pawar withdrew money from his pay checks to contribute to a retirement fund, but only deposited the money into the fund after Johnson threatened legal action. Id. at 24-25. Johnson further claims that it was after he first raised the issue of the missing funds that Pawar unilaterally terminated him. Id. at 25-26.

**B.    Procedural Background**

On December 23, 2013, Swart filed her complaint in Monongalia County Circuit Court, asserting claims against Pawar, MRA,

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Krauland, the Kline firm, and James Bolt ("Bolt")[6]. Swart's complaint sets forth five causes of action: (1) fraud against all defendants, (2) breach of fiduciary duty against all defendants, (3) conversion against Pawar only, (4) legal malpractice against Krauland only, and (5) accounting malpractice against the Kline firm and Bolt. Krauland filed a notice of removal with the Court on January 15, 2014, and included as attachments notices of consent from all the other defendants. All defendants answered the complaint by January 30, 2014.

With their answer, MRA and Pawar filed a counterclaim against Swart that pleads five causes of action against Swart: (1) breach of fiduciary duty by MRA and Pawar, (2) breach of contract by MRA only, (3) contractual interference by MRA only, (4) interference with a prospective contract by Pawar only, and (5) fraud and misrepresentation by Pawar only.

In addition, on February 13, 2014, Pawar and MRA filed a third-party complaint against Stoughton, Johnson, and Mrs. Johnson. The third-party complaint asserts four causes of action: (1) interference with a prospective contract against Stoughton only,

---

[6]Bolt was employed at the Kline firm and, along with Craig Koryak, was the primary accountant assigned to MRA.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

(2) interference with a contractual relationship against all third-party defendants, (3) breach of the loan contract against Johnson only, and (4) breach of the 2009 employment contract against Johnson only.

Swart moved to remand for lack of diversity on February 14, 2014, and to dismiss Pawar and MRA's counterclaim for lack of jurisdiction on February 19, 2014. The Court denied both motions by summary order on April 22, 2014.[7]

On October 27, 2014, the Johnsons answered Pawar and MRA's third-party complaint, and asserted their own counterclaim. Johnson's counterclaim asserts one cause of action for breach of the 2009 employment contract against MRA and Pawar for failing to allow him to his exercise his ownership option.

---

[7]Pawar and MRA's summary judgment motion claims that Swart's answer to their counterclaim failed to respond to MRA's claims and responded only to Pawar (Dkt. No. 10 at 35). Thus, according to Pawar and MRA, Swart has admitted the allegations contained in the motion. Id. For reasons explained later, the Court need not address that issue; however, it must clarify one misconception. In her response, Swart contends that she has a pending motion to dismiss MRA's counterclaims for lack of jurisdiction and that, because it remains pending, she need not answer the counterclaims. Swart is incorrect (Dkt. No. 125 at 28). The Court denied Swart's motion to dismiss (Dkt. No. 14) during the scheduling conference held on April 21, 2014, and confirmed the dismissal in its Summary Order entered April 22, 2015 (Dkt. No. 30).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Along the way, this case shed several defendants. Dr. Stoughton was voluntarily dismissed on April 9, 2015. Krauland, Bolt, and the Kline firm's dismissal followed on August 21, 2015. As a consequence, Swart, Pawar, and MRA are the only parties to the original complaint and counterclaim who remain, while Pawar, MRA, and the Johnsons are the only parties to the third-party complaint and counterclaim.

On August 21, 2015, Swart, along with Pawar and MRA, filed their respective motions for summary judgment, which are fully briefed[8] and ripe for review.

### III. LEGAL STANDARD

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to

---

[8]It should be noted that Pawar and MRA moved the Court for leave to exceed the page limit in their reply to Swart's response to their summary judgment motion on September 25, 2015, the day of the deadline (Dkt. No. 128). They filed the reply contemporaneous with the motion (Dkt. No. 130). The reply was thirty-nine pages, far in excess of the limit, and mostly less than double spaced. The Court denied the motion for leave to exceed the page limit (Dkt. No. 133). To date, Pawar and MRA have not re-filed a compliant reply nor moved for leave to re-file past the deadline.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c)(1)(A). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir.2000). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. Id. at 248-52.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

### IV. DISCUSSION

Pawar and MRA seek summary judgment on all counts of Swart's complaint, and Counts I and II of their counterclaim. Further, they seek summary judgment on Count III of their third-party complaint against Johnson, as well as Count I of Johnson's counterclaim. Swart seeks summary judgment on all counts of Pawar and MRA's counterclaim against her. Despite the plethora of motions, the parties vehemently dispute a myriad of material facts that bear directly on their claims for breach of contract, breach of fiduciary duty, fraud, and conversion.

Among the many disputed facts bearing on the parties' competing breach of contract claims are (1) whether certain contracts are enforceable, (2) whether the actions in questions equate to a breach, (3) whether breach by one party excused performance by the other, (4) whether certain actions fall within their fiduciary duty, (5) whether those actions were, in fact, a breach of that duty, and (6) what damages, if any, were a result of any breach. The parties also dispute facts surrounding Swart's claim of conversion, notably, what property, if any did Swart own personally, and how Pawar exercised dominion over it so as to deprive Swart of its possession and use. Finally, there are factual

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

disputes about whether the parties did or said anything that might give rise to claims of fraud, whether any of the allegedly fraudulent statements were material and false, and whether the claimant justifiably relied on it to their detriment.

After careful review, it is clear that summary judgment on most of the parties' claims for breach of contract, breach of fiduciary duty, fraud, and conversion is inappropriate at this juncture. There are, however, three specific claims that are susceptible to disposition on summary judgment: (1) Swart's claim of conversion as it pertains to Pawar's reimbursed expenses; (2) Pawar's claim of interference with a prospective contract; and (3) Pawar's claim of fraud and misrepresentation as it pertains to his claims that Swart was fired from WVU. Furthermore, the motions present the legal question of whether Pawar has the authority to bring suit on behalf of MRA against either Swart or Johnson. This question requires the Court, as a first priority, to determine whether Pennsylvania or West Virginia law applies to the corporate operations of MRA.

A.  **Pawar's Authority to Bring Suit on Behalf of MRA**

Swart asserts that Pawar has no legal authority to bring suit on behalf of MRA, either in his capacity as MRA's President or as

32

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

a shareholder through a derivative action. Further, she claims that any such action by Pawar would be <u>ultra</u> <u>vires</u> because MRA is a defunct corporation. Finally, she disagrees with Pawar as to which state law governs these issues.

### 1.    Applicable State Law

Pawar asserts that, based on the so-called "internal affairs doctrine," Pennsylvania law should control on matters regarding the internal operations of MRA. Swart, however, claims that West Virginia law should apply based on the "more significant relationship" exception to the internal affairs doctrine.

The internal affairs doctrine has been described by the Supreme Court of the United States as

> "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs——matters peculiar to the relationships among or between the corporation and its current officers, Directors, and shareholders——because otherwise a corporation could be faced with conflicting demands."

<u>Atherton v. F.D.I.C.</u>, 519 U.S. 213, 224 (1997) (quoting <u>Edgar v. MITE Corp.</u>, 457 U.S. 624, 645 (1982). Under the doctrine, the law of the state of incorporation is presumptively controlling. <u>See</u> <u>id.</u> at 224 (citing Restatement (Second) Conflict of Laws § 309). Blind adherence to the presumption, however, has been rejected by the

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Fourth Circuit. <u>Resolution Trust Corp. v. Everhart</u>, 37 F.3d 151, 153 (4th Cir. 1994) (citing <u>RTC v. Chapman</u>, 29 F.3d 1120 (7th Cir. 1994)) ("In cases of Directors' liability, automatic reference to the law of the state of incorporation is rejected."). Indeed, "[t]he presumption can be rebutted by reference to (among other things) 'justified expectations,' 'certainty,' and 'ease in the determination and application of the law to be applied.'" <u>Id.</u> (quoting <u>Chapman</u>, 29 F. 3d. at 1127).

One may rebut the doctrine by showing that another state bears a more significant relationship to parties and their claims. <u>F.D.I.C. v. Baldini</u>, 983 F.Supp.2d 772 (S.D.W.Va. July 14, 2013). The district court in <u>Baldini</u> quoted the Restatement (Second) Conflict of Laws § 302(2) in recognizing the more significant relationship exception:

> The internal affairs doctrine states that "[t]he local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied."

34

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

F.D.I.C. v. Baldini, 983 F.Supp.2d 772, 777 (S.D.W.Va. Nov. 14, 2013). Swart relies exclusively on this excerpt from Baldini to support her argument.

The district court in Baldini, however, went on to explain that the more significant relationship exception applies only in "unusual cases," and "the presumption that the internal affairs doctrine will apply is not easily overcome." Id. at 779. It further narrowed the exception by recognizing the distinct nature of a breach of fiduciary duty claim, notably that such claims are among those most central to a corporation's internal affairs. Id. at 777-78 (quoting In re Fedders North America, Inc., 405 B.R. 527, 539 (Bankr.D.Del. 2009)); see also Fry v. Trump, 681 F.Supp. 252, 255-56 (D.N.J. 1988) ("Claims involving the 'internal affairs' of corporations, such as breach of fiduciary duty and the like, are subject to the laws of the state of incorporation."). Moreover, "an officer's alleged breach of fiduciary duty to a corporation is a matter peculiar to the relationships among and between the corporation and its ... officers and, accordingly, favors application of the law of the state of incorporation." Id. at 778 (internal quotation omitted).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

In <u>Baldini</u>, one party sought to apply the law of the state of incorporation, West Virginia, while the other party wanted to apply the law of Florida, where the business relationship was centered. The business was headquartered and managed in Florida, loan documents were executed in Florida, and the purpose of the business was to expand the Florida market. The court, however, concluded that, "notwithstanding Florida's connection to the [business] relationship, the facts and circumstances here are not so unusual that Florida law should govern defendants' duties and liabilities as officers of [the company]." <u>Baldini</u>, 983 F.Supp.2d at 778-79. The court also observed that the case was not unusual and did not clear the bar to rebut the presumption, particularly for claims of breach of fiduciary duty. Consequently, it concluded that West Virginia law applied. <u>Id.</u> at 78-79.

Here, Swart asserts that there are a number of reasons why West Virginia has a more significant relationship with the claims and parties than does Pennsylvania. Swart's argument, however, ignores the parties' significant relationship with Pennsylvania. For example, Pennsylvania is where Pawar lives, where MRA was lawfully incorporated, where all of the accounting, payments, and disbursements were handled, and where MRA's legal services were

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

rendered. Furthermore, because the language in MRA's articles of incorporation and Bylaws was so clear,[9] the parties should have had the "justifiable expectation" that the laws of the state of incorporation would apply to MRA. Resolution Trust Corp., 37 F.3d at 153.

Notwithstanding Swart's legitimate assertions that MRA and the parties have a significant relationship to West Virginia, this case, like Baldini, is not unusual and does not overcome the presumption that the law of the state of incorporation should apply to the internal affairs of MRA. Accordingly, the Court will apply the law of Pennsylvania to the parties' claims regarding breach of fiduciary duty and to determine whether Pawar may bring suit on behalf of MRA.

**2.    Authority to Bring Suit as President**

Under Pennsylvania law, a corporation's management is solely the province of its Board of Directors. Section 1721(a) of the Pennsylvania Business Corporation Law of 1988 (the "PABCL") defines the management role of a corporation's Board:

---

[9]Paragraph 16 of the "Amended and Restated Agreement of Shareholders of Monongalia Radiology Associates, P.C." states clearly that, "This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania." (Dkt. No. 122-1 at 7).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

> General rule.--**Unless otherwise provided by statute or in
> a bylaw adopted by the shareholders**, all powers
> enumerated in section 1502 (relating to general powers)
> and elsewhere in this subpart or otherwise vested by law
> in a business corporation shall be exercised by or under
> the authority of, and the business and affairs of every
> business corporation shall be managed under the direction
> of, a Board of Directors. **If any such provision is made
> in the bylaws, the powers and duties conferred or imposed
> upon the Board of Directors by this subpart shall be
> exercised or performed to such extent and by such person
> or persons as shall be provided in the bylaws.** Persons
> upon whom the liabilities of Directors are imposed by
> this section shall to that extent be entitled to the
> rights and immunities conferred by or pursuant to this
> part and other provisions of law upon Directors of a
> corporation.

(emphasis added). Among the general powers under PACBL § 1502 is
the power "to sue and be sued, complain and defend and participate
as a party or otherwise in any judicial, administrative,
arbitrative or other proceeding in its corporate name." 15 Pa.C.S.
§ 1502(a)(2). Thus, the power to file a lawsuit in MRA's name is
squarely within its Board's discretion unless specifically
delegated to an individual officer under the Bylaws.

Looking to MRA's Bylaws, the parties disagree on which
provision of the Bylaws controls. Swart argues that Article II,
§ 11, titled "Vote or Consent of Shareholders," limits Pawar's
authority. That section of the Bylaws reads as follows:

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

> Whenever any corporate action, other than the election of
> Directors, is to be taken by vote of the shareholders, it
> shall, except as otherwise required by law, be authorized
> by a majority of the votes cast at a meeting of
> shareholders by the holders of shares entitled to vote
> thereon.

(Dkt. No. 120-1 at 5). Swart asserts that this language "provides
that a majority vote is required for corporate action." (Dkt. No.
120 at 3.

This section, however, simply provides that <u>when</u> a corporate
action requires a vote of the <u>shareholders</u>, a simple majority will
authorize the action—-as opposed to a super majority or unanimous
vote. It does not speak to the power of the Board of Directors or
corporate officers under the Bylaws.[10] Thus, the relevant premise
is that general powers are the Board's, which may exercise them or
delegate them to corporate officers.

Pawar contends that Article IV, § 5, of MRA's Bylaws
specifically confers upon him the power to sue in MRA's name. That
provision provides in pertinent part:

> The President shall be the chief executive officer of the
> Corporation, shall have <u>general and active management</u> of
> the business of the Corporation and shall see that all

---

[10]To be sure, this provision applies to the election of
Directors, as well as the adoption and any subsequent changes to
the Bylaws, but those actions are not at issue here.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

> orders and resolution of the Board of Directors are
> carried into effect ...

(emphasis added). According to Pawar, "general and active
management" includes the ability to sue in the corporate name
without Board approval. In support, he cites a 1978 decision by the
Pennsylvania Court of Common Pleas. Harcourt Wells, Inc. v. Cohen,
6 Pa. D&C 3d 183 (Pa. Com. Pl., Phila. Cty. 1978).

In Harcourt, the president filed suit in the name of the
company against, inter alia, a corporate officer and Harcourt's
majority shareholders. The court noted that,

> [a]lthough this appears to be a case of first impression
> in Pennsylvania, in other jurisdictions it is an accepted
> principle that where there has been no direct
> prohibition, the president of a corporation has
> presumptive authority, in the discharge of his duties, to
> defend and prosecute suits in the name of the
> corporation.

Id. at 187-88. (citing Cicero Industrial Dev. Corp. v. Roberts, 312
N.Y.S. 2d 893 (Sup. Ct. Onandaga Co. 1970)). Further, the court
opined that "'[i]f the president is the general manager of the
corporation, there is little doubt that he has broad powers to sue
under orthodox agency rules.'" Id. at 188 (quoting Cicero, 312
N.Y.S. 2d at 898).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Pawar's reliance on Harcourt is misplaced. In the nearly forty years since Harcourt was decided, courts have been reluctant to afford corporate presidents broad authority to sue in the corporate name, particularly in instances where the suit would be against a co-equal 50% shareholder.[11] In fact, since 2006, it appears that Pennsylvania courts have rejected outright such a broad presumption of power. See McGuire Performance Solutions, Inc. v. Massengill, 904 A 2d 971 (Pa. Super. Ct. 2006) (rejecting Harcourt's presumption that a president has presumptive power to sue in corporation's name).

The court in McGuire also made the following important distinction:

> Further, it must be noted that Appellant had not been
> sued in his capacity as a shareholder, nor did he bring

---

[11]Indeed, the United States District Court for the District of New Jersey, applying New York law, rejected Cicero, the case on which Harcourt largely relied. See Ono v. Itoyama, 884 F. Supp 2d 892 (D.N.J. 1995) ("Hence, defendants argue, where the president is a 50% shareholder and sues the other 50% shareholder, the action must be brought derivatively. Indeed, there is ample authority for this proposition." (citing Executive Leasing Company, Inc. v. Leder, 191 A.D.2d 199, 200 (N.Y. 1993)("where there are only two stockholders each with a 50% share, an action cannot be maintained in the name of the corporation by one stockholder against another with an equal interest and degree of control over corporate affairs; the proper remedy is a stockholder's derivative action"))).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

> a countersuit in the nature of a shareholder's derivative
> action challenging the actions of McGuire's corporate
> officers. Rather, **McGuire sued Appellant as a third-party
> debtor to the corporation** who had defaulted on his debt
> and security instruments. Even if McGuire's board of
> directors had not passed a resolution authorizing
> McGuire's president to institute the present lawsuit,
> Appellant cites no authority that this circumstance gives
> him standing to assert as a legal defense that McGuire's
> president acted beyond his authority, where the lawsuit
> was instituted to recover monies owed to the corporation
> by Appellant in Appellant's role as a third-party debtor
> to the corporation.

Id. at 977 (emphasis in original). Thus, McGuire recognized the

difference between a suit against another shareholder, and the

typical sort of suit to collect third-party debts that one might

pursue in the general and active management of a corporation.

Other courts have followed suit in rejecting Harcourt's

presumption. See e.g. Amramsky v. Zmirli, 2013 WL 373274 (E.D.Pa.

Jan. 31, 2013) (unpublished) (explicitly rejecting, albeit in a

footnote, any presumptive authority under Harcourt). In fact, the

court in Amramsky opined that any such presumption is "contrary [to

the] language of the Pennsylvania Business Corporation law" and

"does not appear to be a generally accepted principle in

Pennsylvania law."[12] Id. at n. 2. This Court agrees.

---

[12]Other states have also accepted the distinct nature of a suit
initiated by a 50% co-equal owner against the other 50% co-equal

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

The PACBL is clear; the general powers listed under PACBL § 1502(a), including the authority to bring suit, rest solely with the Board of Directors "[u]nless otherwise provided . . . in a bylaw adopted by the shareholders . . . ." The confusion stems from the ambiguous language in Article IV, § 5, of MRA's Bylaws, and whether the power to bring a suit of this nature is within the "general and active management of the business of the Corporation." This is where the distinction between suits against a 50% co-equal owner, or any shareholder for that matter, and suits against third-parties to enforce the rights of the corporation is critical.

Even if this Court were to accept the premise that the language of Article IV, § 5, grants the president the power to bring suit, it doubts this is the type of suit it would presumptively, rather than explicitly, authorize. It is self-evident that suits to enforce the corporation's rights against third parties, such as debt collection and contract enforcement

_____

owner. See e.g. Barry v. Curtin, 993 F.Supp.2d 347, 352-53 (E.D.N.Y. Jan. 31, 2014) ("'Under New York law, a shareholder derivative action is an appropriate method for one fifty-percent shareholder to obtain relief in the name of the corporation against the other fifty-percent shareholder.'") (quoting Tuscano v. Tuscano, 403 F.Supp.2d 214, 222 (E.D.N.Y. Dec. 12, 2005)).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

actions, are related to the "business of the Corporation."

Accordingly, suits on behalf of the corporation in these instances

can rationally be considered to be within the general and active

management of that business.[13] On the contrary, suits grounded in

claims against actions by shareholders, such as breach of fiduciary

duty and breach of loyalty, are not part and parcel of the business

of the corporation. Consequently, these types of suits are not

within the general and active management of the business.[14]

---

[13]Under this premise, Pawar, as President of MRA, has the
presumptive power under his general and active management duties to
bring suits against third-party debtors, which is exactly what he
has done by bringing the third-party complaint on behalf of MRA
against Johnson. Of course, should MRA secure a judgment against
Johnson, any disbursement of those proceeds as profit would be
split between Pawar and Swart as co-equal shareholders.

[14]In addition, one questions the presumption allowing a
President to bring suit against a 50% co-equal shareholder when
both have equal authority by virtue of their equal ownership and
equal position as the two sole Directors. See L.W. Kent and Co.,
Inc. v. Wolf, 143 A.D.2d 813, 814 (N.Y.A.D. 2 Dept., 1988) (citing
Tidy-House Paper Corp. of N.Y. v. Adlman, 4 A.D.2d 619, 621 (N.Y.
1957)("[t]he query then is whether such a presumption applies when
the president seeks to maintain an action against one who has as
much control over the plaintiff corporation as the president
himself")). Further, the Bylaws provide that the President "shall
see that all orders and resolutions of the Board of Directors are
carried into effect." Query whether there is an inverse presumption
prohibiting the President from bringing this type of suit because,
presumptively, there would never be an order or resolution agreed
to by one of the two directors authorizing the other to bring suit
against himself on behalf of the corporation.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

In conclusion, the Court adopts the reasoning of those jurisdictions holding that suits cannot be brought by one 50% co-equal shareholder against the other 50% co-equal shareholder. Accordingly, it concludes that Pawar cannot sue on behalf of MRA in his capacity as its president, and that the proper avenue for such a lawsuit is through a derivative action.[15]

### 3. Bringing a Derivative Action as Shareholder

Under Federal Rule of Civil Procedure 23.1, "one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Compliance with Rule 23.1 requires that the complaint "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). "Under Pennsylvania law, a

---

[15]Interestingly, the court in <u>Amramsky</u> allowed the plaintiffs to join the corporation as a defendant with its president. However, the court ordered the corporation to secure its own counsel separate from the president's because of possible conflicts of interest. <u>Amramsky</u>,2013 WL 373274 at *4.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

shareholder cannot ordinarily bring an action on behalf of the corporation without first making demand on the board of directors to pursue the action." Warden v. McLelland, 288 F.3d 105, 110 (3rd Cir. 2002) (citing Cuker v. Mikalauskas, 692 A.2d 1042, 1049–50 (Pa. 1997)); see also Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 96 (1991) ("[Rule 23.1] clearly contemplates both the demand requirement and the possibility that demand may be excused . . . .").

In Kamen, however, the Supreme Court noted that the "demand requirement of Rule 23.1 relates to the 'adequacy of the shareholder representative's pleadings,' and does not itself necessarily require demand." Kanter v. Barella, 489 F.3d 170, 176 (3rd Cir. 2007) (quoting Kamen, 500 U.S. at 96). "Furthermore, 'the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of "substance," not "procedure."'" Id. (quoting Kamen, 500 U.S. at 96–97).

Accordingly, "federal courts hearing shareholders' derivative actions involving state law claims apply the federal procedural requirement of particularized pleading, but apply state substantive law to determine whether the facts demonstrate demand would have

46

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

been futile and can be excused." Id. (citing Kamen, 500 U.S. at 98-99; see also Gomes v. American Century Companies, Inc., 710 F.3d 811 (8th Cir. 2013) (holding that, when a claimant fails to make a pre-suit demand prior to pursuing derivative claims that arise under state law, a federal court must apply state law to determine whether the demand is excused). Moreover, "what must be shown in the complaint to justify excusing compliance with the requirement is a matter of judicial discretion." 7C Charles Alan Wright & Arthur Miller, Fed. Prac. & Proc. Civ. § 1831 (3d ed. 2015) (citing Garber v. Lego, 11 F.3d 1197 (3rd Cir. 1993) and compiling cases).

In sum, a claim fails if it is inadequately pleaded under Fed. R. Civ. P. 23.1; if adequately pleaded, the inquiry then becomes whether the actual demand is adequate under state law. Here, Pawar's counterclaim fails to plead with particularity any effort by the plaintiff to secure the desired action from the directors of MRA. Moreover, the counterclaim is silent as to the reasons for failing to do so, or not making the effort as required under Rule 23.1. Therefore, Pawar has not adequately pleaded his derivative action claim, and it therefore fails as a matter of law.

Notwithstanding the inadequacy of the counterclaim, Pawar insists that demand was excused due to futility. This claim also

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

fails. In 1997, the Supreme Court of Pennsylvania abandoned the futility exception to the demand requirement when it "specifically adopt[ed] §§ 7.02-7.10, and § 7.13 of the ALI Principles." Cuker v. Mikalauskas, 692 A.2d 1042, 1049 (Pa. 1997). Section 7.03 of the ALI Principles is clear:

> Exhaustion of Intracorporate Remedies: The Demand Rule
>
> (a) Before commencing a derivative action, a holder or a director should be **required to make a written demand** upon the board of directors of the corporation, requesting it to prosecute the action or take suitable corrective measures, unless demand is excused under § 7.03(b). The demand should give notice to the board, with reasonable specificity, of the essential facts relied upon to support each of the claims made therein.

Id. at 1050 (emphasis added). Section 7.03(b) provides that the lone situation when demand may be excused is when "the plaintiff makes a specific showing that irreparable injury to the corporation would otherwise result, and in such instances demand should be made promptly after commencement of the action." Id.; see also Warden v. McLelland, 288 F.3d 105, 111 (3rd. Cir . 2002) ("But Cuker, which established that a demand is excused only if irreparable harm to the corporation is shown, changed the law on demand requirements in derivative actions.'" (quoting Drain v. Covenant Life Ins. Co., 712 A.2d 273, 278 (Pa. 1998))).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Pawar made no such written demand, has made no showing whatever that irreparable injury would have resulted by making such a demand, and failed to do so promptly after the suit was filed. Therefore, even if Pawar's claims had been adequately pleaded, his failure to make demand, or to excuse the need for such, precludes the derivative action.[16] Accordingly, the Court **CONCLUDES** that Pawar lacked the authority to sue Swart on behalf of MRA, and **GRANTS** Swart's motion for summary judgment as to the counterclaims of Pawar and MRA for breach of fiduciary duty, breach of contract, and contractual interference insofar as they pertain to MRA.

**B.    Conversion**

Pawar seeks partial summary judgment on Count III as it pertains to the allegations in paragraph 129, subsections(c), (d), (e), and (f) of Swart's complaint. Subsection (c) of Paragraph 129 of Swart's complaint asserts a claim of conversion against Pawar based on allegations that MRA, through the Kline firm, reimbursed Pawar for a long list of personal expenses couched as business

---

[16]Swart's motion also asserts that Pawar acted <u>ultra vires</u> by unilaterally initiating suit on behalf of a "defunct corporation" (Dkt. No. 120 at 2). As the Court has found Pawar unable to bring suit on behalf of MRA in either his capacity as its president or through his own derivative action, it need not address here the question of whether Pawar acted <u>ultra vires</u>.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

expenses. For his part, Pawar contends that the expenses were legitimate business expenses and, nevertheless, Swart was equally compensated through the "even-up" accounting process. Pawar further asserts that any such claims are barred by the two-year applicable statute of limitations.

Subsections (d) and (e) of Count III accuse Pawar of conversion by misrepresenting to Swart that both MGH and PMH required him to receive a higher salary. Subsection (f) accuses Pawar of conversion through his unilateral hiring of doctors who required expensive tail insurance. Pawar claims that the accusations in subsections (d), (e), and (f) do not state claims for conversion and, he therefore is entitled to summary judgment on those claims.

The Supreme Court of Appeals of West Virginia defines conversion as

> [a]ny distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is proved the plaintiff is entitled to recover irrespective of good or bad faith, care or negligence, knowledge or ignorance.

Long v. M & M Transp., LLC, 44 F.Supp.3d 636, 651 (N.D.W.Va. Sept. 5, 2014) (quoting Syl. Pt. 17, Rodgers v. Rodgers, 399 S.E.2d 664,

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

668 (1990)). As a threshold issue, the Court must determine whether any of the property that is the subject of Swart's claims was actually her property.

It is well settled that "the property and rights of an incorporated company belong to the united association, acting in the corporate name, and not to the stockholders." Syl. Pt. 4, Moore v. Schoppert, 22 W.Va. 282, 283 (1883). Furthermore, the Supreme Court of Appeals of West Virginia "has held that '[a]n action for conversion of personal property cannot be maintained by one without title or right of possession.'" Thompson Development, Inc. v. Kroger Co., 413 S.E.2d 137, 142 (W.Va. 1991) (quoting Syl. Pt. 1, Kisner v. Commercial Credit Co., 174 S.E. 330 (W.Va. 1934)).

All of the monies that are the subject of Swart's conversion count in the complaint were the property of MRA, regardless of the theory of conversion espoused by Swart. Pursuant to Fed. R. Civ. P. 17(a), "[a]n action must be prosecuted in the name of the real party in interest," which, in the case of the monies Swart claims were converted, is MRA. Thus, the proper avenue would have been for Swart to bring a derivative suit on behalf of MRA.[17]

---

[17]Similar to Pawar, Swart, as Treasurer and a Director of MRA, did not have the power to bring suit on behalf of MRA directly. See

51

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Swart, of course, could bring other causes of action seeking damages from Pawar for the effects his actions had on her personally. Indeed, this is exactly what she has done in her claims for fraud and breach of fiduciary duty in Counts I and II.

Based on the foregoing, Swart's conversion claim fails. Accordingly, the Court **GRANTS in PART** Pawar's motion for partial summary judgment on Swart's claim for conversion as it pertains to Paragraph 129, subsections (c)-(f). Furthermore, while the Court declines to dismiss the entirety of Swart's conversion claim, it notes that Swart will have to make a showing that she personally, as opposed to MRA, had title to the allegedly converted property. Finally, as a consequence of this ruling, the Court need not address Pawar's statute of limitation defense.

## C. Interference with Prospective Contract

"In West Virginia, to state a claim for intentional interference with a prospective business contract, '[a] plaintiff must prove:

(1)  existence of a contractual or business relationship or expectancy ...;
(2)  an intentional act of interference by a party outside that relationship or expectancy ...;

---

generally, supra Part IV.A.2.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

    (3)   proof that the interference caused the harm
        sustained; and

    (4)   damages.'"

Backwater Properties, LLC. v. Range Resources-Appalachia, LLC, 2011
WL 1706521, at *8 (N.D.W.Va. May 5, 2011) (quoting Torbett v.
Wheeling Dollar Sav. & Trust Co., 314 S.E.2d 166, 173 (W.Va.
1983)).

Pawar alleges that Swart interfered with his prospective
contract with MGH to provide radiology services after the implosion
of MRA. According to Pawar, Swart made false statements and
misrepresentations to certain members of MGH's Board about Pawar's
"ethnicity, management style, professional abilities,
trustworthiness, and alleged financial mishandlings" (Dkt. No. 10
at 36). Pawar asserts that those Board members subsequently
"intervened in the selection process of a new provider for MGH
radiology services and Pawar was excluded from consideration." Id.
Swart contends that there are no material facts that can support
Pawar's allegation, and that, notably, Pawar's response does not
refute any of those assertions. Indeed, Pawar's response does not
defend his claim.

Even when the facts presented are considered in the light most
favorable to Pawar, his claim of interference with prospective

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

contract clearly is doomed. First, he has admitted that he has no evidence of anyone to whom Swart made the disparaging remarks:

> Q.   Okay. Can you give me -- can you give me the names
>      of people that you know for a fact Dr. Swart called
>      and, for lack of a better phrase, said something
>      bad about you?
>
> A.   I do not have list of people, but hopefully, during
>      the discovery process, we can find out.
>
> Q.   Can you give me one name today?
>
> A.   I could not and will not because it will be
>      speculative.

(Dkt. No. 120-6 at 1-2). Pawar thus can do no more than speculate as to whom Swart might have made disparaging remarks, let alone whether such person was involved with the contract selection process. His failure to respond to Swart's motion for summary judgment on this claim underscores that the discovery process has revealed no such person.

Furthermore, Pawar has presented no evidence of the "existence of a contractual or business relationship or expectancy" (beyond his six month contract with MGH) following MRA's collapse in December, 2011. Further, the evidence adduced during discovery establishes that Pawar garnered a six-month interim contract to provide services to MGH through his newly formed entity, and that

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

he submitted an unsuccessful bid to provide future services through the RFP process. When he did not win the bid, Pawar made no further attempts to contract with MGH and began working from home:

> Q.    Okay. Have you -- since MRA ceased functioning, did you attempt to secure contracts with any hospital or group?
>
> A.    Mon General Hospital was the only place where I -- Mon General Hospital was the only hospital where I bid for -- through RFP. And subsequent to that, after MRA ceased business, in December of 2011, I continued providing services at Mon General Hospital for six months.
>
> Q.    Okay. Through your new entity?
>
> A.    That is correct.
>
> Q.    And then -- but you didn't obtain a contract?
>
> A.    We just had a six months' contract for services. Our contract was for six months.
>
> Q.    And then after the six months was over, what happened?
>
> A.    After that I started working from home.

(Dkt. No. 120-5 at 1).

In sum, Pawar's testimony establishes that (1) he had no contractual expectation; (2) he cannot show that Swart intentionally interfered with any such contract by speaking to a particular person with input into the contract selection process;

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

and (3) he has no evidence that any such alleged statements by Swart caused his failure to secure the contract with MGH through the RFP process. This is further supported by Pawar's failure to respond directly to this issue. Accordingly, the Court **GRANTS** Swart's motion for summary judgment on Pawar and MRA's counterclaim for interference with prospective contract.

**D.    Pawar and MRA's Counterclaim of Fraud and Misrepresentation**

In order to maintain a claim of fraud under West Virginia law, a the claimant must prove

> (1)  that the act claimed to be fraudulent was the act of the defendant or induced by him;
> (2)  that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and
> (3)  that he was damaged because he relied on it.

Syl. Pt. 2, <u>Quicken Loans, Inc. v. Brown</u>, 737 S.E.2d 640, 644 (W.Va. 2012) (internal quotations and citations omitted).

Pawar and MRA claim that Swart committed fraud and made false and misleading misrepresentations on which Pawar relied to his detriment. Among those misrepresentations, Pawar claims that Swart told him she had resigned from her previous employment at WVU (Dkt. No. 10 at 37). Pawar and MRA's counterclaim asserts that, upon information and belief, Swart was "either terminated or forced to

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

resign as a result of her poor work habits and personal conduct,

which she later exhibited in the performance of her duties with

Pawar and MRA." <u>Id.</u>

Swart asserts that Pawar cannot affirmatively establish that

she was fired by WVU:

> Q:    Okay. So did Dr. Marano say that Dr. Swart was
>       fired from
>       WVU?
>
> A:    Do not remember.

(Dkt. No. 123 at 12). Pawar, on the other hand, maintains that his

testimony goes on to raise a dispute as to a material fact:

> Q:    Well, that's pretty important, isn't it? You've got
>       that in your lawsuit, don't you? In your
>       counterclaim in this case you talk about Dr. Swart
>       and what she said to you to -- so she could come on
>       board as a shareholder, and part of that relates to
>       what she said about WVU; right?
>
> A:    That is correct. I do not know if she was asked to
>       leave or given a termination notice or she was
>       fired. Fired is a very --very specific word. And --
>
> Q:    What did Dr. Marano say about that?
>
> A:    That she was asked to leave.

<u>Id.</u> Moreover, Pawar points to statements by Peggy Pust, Vice

President of Operations at MGH, for support that Swart was fired:

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Q:    Did you ever have any occasion to hear rumor about
      her separation from West Virginia, whether she was
      terminated or left voluntarily?

A:    Anything I heard in rumor, again, I would never act
      on, I – I understand that –

Q.    I'm not –

A.    – that she was terminated.

Q.    You understood that?

A.    Yeah, I can't tell you who told me that, if that
      was just a general understanding, but I do not know
      the circumstances.

Q.    That's all I'm –

A.    Yeah.

Q.    Not if you know any particulars. Just whether that
      was rumor or whether that was something that was
      discussed or somehow out there in the world of
      rumor. That's all I'm –

A.    Yeah.

(Dkt. No. 123-2 at 4).

    To Swart's characterization that these are "bare double

hearsay assertions"[18] (dkt. no. 120 at 9), Pawar merely reiterates

---

[18]Presumptively, Swart claims the assertions are double hearsay
because Peggy Pust would have had to heard the rumor from someone
else, despite admitting she did not know who, and Murano also would
have had to heard the claim from someone else because he was not in
a supervisory position that would allow him to know the reasons for
her departure. See Dkt. No 129 at 13.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

Dr. Marano's alleged statement that Swart was asked to leave.[19] He contends that the statements raise an issue of material fact and that issues of admissibility are not properly determined on motions for summary judgment. There is no basis for such a broad assertion, however.

Not only has the Fourth Circuit declined an absolute prohibition on considering hearsay statements on summary judgment motions, see Whittaker v. Morgan State University, 524 Fed. Appx. 58, 60 (4th Cir. 2013) (unpublished), it reviews such considerations with approbation. In Whittaker, a professor in a wrongful termination suit sought to avoid summary judgment by attaching to his own affidavit an unsworn letter by a former student. Id. The trial court concluded that the letter was inadmissible hearsay and granted summary judgment against the professor. Id. On appeal, the Fourth Circuit found "no abuse of discretion in the district court's decision to exclude [the student's] letter from its consideration." Id. (citing Nader v. Blair, 549 F.3d 953, 963 (4th Cir. 2008) (noting that the district

---

[19]Swart's reply correctly notes that Pawar did not depose Marano and did not include an affidavit from Marano with his response (Dkt. No. 129 at 13).

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

court's determination regarding the admissibility of evidence for summary judgment purposes is reviewed for an abuse of discretion). The court opined that, "[w]hile a party may support its position on summary judgment by citing to almost any material in the record, the party's reliance on that material may be defeated if 'the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" Id. (quoting Fed.R.Civ.P. 56(c)(2)); see also Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affidavits cannot be conclusory or based upon hearsay." (citations omitted)).

Here, Pawar's evidence is even less persuasive than the hearsay relied on in Whittaker. The statements are hearsay, if not double hearsay, and Pawar does not argue to the contrary. Indeed, while implicitly agreeing that the statements are hearsay, he contends, erroneously, that a court ought not consider admissibility at this stage. This Court, however, will not allow naked hearsay, particularly statements as dubious as those from the "rumor mill," to stand alone against summary judgment. Rahrig v. Alcatel USA Marketing, Inc., 217 Fed. Appx. 189, 193 (4th Cir. 2006) (noting that testimony based on "office rumors" was

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

"inadmissible hearsay and was properly not considered material evidence to deny [defendant's] motion for summary judgment" (citing Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995) ("proffered evidence of un-attributed rumors is inadmissible hearsay. Such evidence is neither admissible at trial nor supportive of an opposition to a motion for summary judgment").

Because Pawar has offered no other credible evidence that might raise an issue of material fact regarding Swart's departure from WVU, the Court **GRANTS** Swart's motion for summary judgment regarding Pawar and MRA's counterclaim for fraud and misrepresentation pertaining to claims surrounding Swart's departure from WVU.

## SUMMARY OF THE COURT'S RULINGS

In summary, for the reasons discussed, the Court:

1. **CONCLUDES** that Pennsylvania law applies to: (1) the internal workings of MRA; (2) the parties' claims regarding breach of fiduciary duty; and (3) the issue of whether Pawar may bring suit on behalf of MRA;

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

2.   **GRANTS IN PART** Pawar and MRA's motion for summary judgment as to Count III of Swart's claim and **DISMISSES WITH PREJUDICE** the following claims:

   a.   that Pawar converted expenses as described in detail in paragraph 129, subsection (c) of Swart's complaint;

   b.   that Pawar converted monies received as a result of his claim that MGH and PMH required him to receive a higher salary as described in paragraph 129, subsections (d) and (e) of Swart's complaint; and

   c.   that Pawar converted monies spent on tail insurance coverage of MRA employees as described in paragraph 129, subsection (f) of Swart's complaint;

3.   **GRANTS IN PART** Swart's motion for summary judgment as to Counts I, II, III, IV, and V of Pawar and MRA's counterclaim and **DISMISSES WITH PREJUDICE** the following claims:

   a.   MRA's claim of breach of fiduciary duty;

   b.   MRA's claim of breach of contract;

   c.   MRA's claim of contractual interference;

   d.   Pawar's claim of interference with prospective contract; and

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

e.    Pawar's claim that Swart committed fraud and misrepresentation regarding the reasons for her departure from WVU.

4.    **DENIES** Pawar and MRA's motion for summary judgment on Count III of their claim against Eric Johnson, and also on Count III of Johnson's counterclaim.

### Summary of Remaining Claims

The following claims remain for trial:

1.    Swart's claims of:

a.    fraud against Pawar and MRA;

b.    breach of fiduciary duty against Pawar and MRA; and

c.    conversion against Pawar only as to those items not included in paragraph 129, subsections (c)-(f) of Swart's complaint that she may establish were her personal property as opposed to property of MRA;

2.    Pawar's claims of:

a.    breach of fiduciary duty against Swart; and

b.    fraud and misrepresentation against Swart for any alleged fraudulent statements or misrepresentations other than those surrounding her departure from WVU;

3.    Pawar and MRA's third-party claims of:

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
[DKT. NO. 117] AND GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 119]**

a.    interference with a contractual relationship by Pawar and MRA against Cynthia Johnson and Eric Johnson;

b.    breach of the loan contract by MRA against only Eric Johnson; and

c.    breach of the employment contract by MRA against only Johnson;

4.    Eric Johnson's counterclaim of:

a.    breach of contract against Pawar and MRA.

It is so **ORDERED**.

The Court directs the Clerk to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: November 19, 2015

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE